## CITIZENS CAS. CO. OF NEW YORK v. READY TRUCK LINES, Inc.
### No. 10733.

United States Court of Appeals
Seventh Circuit.
April 24, 1953.

**392**

Harold H. Bredell, Indianapolis, Ind., George F. Callaghan, Chicago, Ill., Bredell, Cooper & Martin, Indianapolis, Ind., of counsel, for appellant.

Mark W. Rhoads and George H. Kistler, Indianapolis, Ind., Rhoads, Linder, Kistler & Peden, Indianapolis, Ind., of counsel, for appellees.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

DUFFY, Circuit Judge.

In this action plaintiffs seek to recover insurance premiums allegedly due and unpaid. On August 5, 1948, plaintiff insurance company issued a liability insurance policy in standard form to Ready Truck Lines, Inc. (hereinafter called the company). The contract was negotiated for the company by its president, Sidney J. Williams, who at that time owned all of the capital stock of the company. The H. C. Baldwin Agency, Inc. and M. B. Raub represented the insurance company. The policy protected the company against third party claims for bodily injury and property damage to the extent of $100,000 for each person and $300,000 for each accident as to bodily injury, and to the extent of $100,000 for each accident as to property damage. The rate of premium was divided between primary limits of $5,000 for each person and $10,000 for each accident as to bodily injury, and $5,000 for each accident as to property damage, and the excess over said $5,000/$10,000 was regarded as "excess premium." The premium was on the basis of $2.90 for each $100 of gross receipts of the company, the primary premium being fixed at $2.16 and the excess at $0.74.

On September 1, 1948, Sidney J. Williams entered into contracts with four persons for the sale of his stock in the company. The agreements were recorded in Chicago, Illinois, on September 4, 1948. Each purchaser agreed to buy 50 shares for $50,000, paying $500 down and $250 per month thereafter until the entire purchase price was paid, and Williams to retain possession of all shares until payment had been made of the entire purchase price; however, Williams executed and delivered proxies to the purchasers. The following conditions were included in the purchase agreements: "It is agreed by the Buyer that at any meeting of the shareholders aforesaid, no matter of amendment of the corporate charter, merger, or consolidation with any other corporation or any other change in the corporate structure or issuance of additional stock or reduction of shares or change in

value of assets, capitalization or issuance of bonds or other evidences of indebtedness or any other matters other than in the usual and normal course of business will be considered voted upon or effected without the express written consent of the Seller; * * * and the assets of the Corporation * * * shall not be sold, pledged, leased or otherwise disposed of without the express written consent of the Seller." The sales agreements were approved by the corporation, and were made a part of the minutes of the board of directors.

The four purchasers were elected directors, and the directors elected the following officers: John S. Williams, president; Charles Jonas, vice president; William Yagman, secretary; and Irving Friedman, Treasurer. Sidney J. Williams was retained by the company as general manager.

Sometime after the middle of October, 1948, Voris Lyons, an officer of the Baldwin Agency, went to the office of the company and urged Sidney J. Williams, Jonas and Friedman to agree to a modification of the insurance policy by approving of a suggested "Retrospective Rating Plan X" (hereinafter sometimes called Plan X). Sidney J. Williams expressed his strong opposition to any such plan and told Lyons that neither Friedman nor Jonas would be in a position to sign such an agreement. Thereafter Mr. Raub, representing the insurance company, urged that the company agree to the proposed modification of the insurance policy, stating that otherwise it would be necessary to increase the premiums one-half of one percent. Williams told Raub, "We will pay the increase, but there will be no signing of any Retrospective Agreement." During one discussion in Raub's presence Friedman stated that he was willing to sign the agreement, and an argument between Williams and Friedman ensued, and Williams advised Raub that the agreement would not be binding with Friedman's signature unless Williams also signed. In the course of his discussion with Lyons and Raub, Williams said that the agreement would put the company into the insurance business and would be gambling with the property of the corporation, and that it was outside the normal course of business.

Lyons had the provisions of the proposed plan typewritten on a plain piece of paper. Underneath the conditions, as stated, there appeared, "Accepted & Signed By," followed by a blank space large enough for a signature. On the opposite side of the page was another place for a signature under the word, "Witness." At the bottom of the page appeared the following: "Attached to and forming a part of policy 114512 of the Citizens Casualty Company issued to the Ready Truck Lines, Inc. of Indianapolis, Ind. and Harvey, Illinois, H. C. Baldwin Agency, Inc., Effective Date: August 5, 1948," followed by the word, "Countersigned," with another space for signature. Lyons testified that about December 1, 1948, he brought this paper prepared by him to the office of the company, and that he had already affixed his signature in the space next to the word, "Countersigned." Lyons presented the paper to Friedman and Jonas, neither of whom signed it at that time. Under date of December 1, 1948, Lyons addressed a letter to Friedman, one paragraph of which stated, "I sincerely believe that the plan will work very satisfactorily to your account and if you, Mr. Jonas and Mr. Williams will sign it and return it promptly, I will appreciate it very much."

On December 2, 1948, Lyons wrote to an official of the insurance company at New York and, in referring to Jonas and Friedman, said, "They agreed that Mr. Williams would go along and that they would sign our endorsement and have it back to us within a few days. I am quite certain they will and I will be forwarding it to you."

A few days thereafter, probably about December 8, Friedman signed the paper without indicating that he did so as an officer of the company or in a representative capacity, and Jonas signed it as a witness. Sidney J. Williams testified that he did not know that the paper had been signed although he knew Friedman had handed some kind of a paper over to Lyons.

Thereafter the insurance company continued to bill the company monthly in the same manner and on the same basis as before the paper was signed by Friedman. The company paid premiums totaling $22,-

301.06 for the entire period of the policy; the total losses paid or reserved during that period were $22,720.35.

The company cancelled the policy as of June 1, 1949. On the basis of the formula developed in Plan X, an additional premium of $21,238.57 would be due, computed over the entire period of the policy. Holding that Plan X was a valid part of the insurance policy, the district court entered judgment for the plaintiffs against the company for $21,238.57.

Although it was testified that some other truck lines had included in their insurance policies a provision similar to Plan X, nevertheless it was an extraordinary document. Incurred losses were defined therein to mean actual loss payments, loss reserves, and allocated claim expenses. Lyons testified that under such plan, all incurred losses within the primary limits of $5,000/$10,000 would be charged to Ready Truck Lines, and in addition to paying such losses the truck line would be required to pay the insurance company an additional amount so that the losses of the company would be only 60% of the amount of the premium. There would be no refund to the truck line unless its loss ration was 60% or below, which was exceedingly unlikely in view of the previous experience of the company.

Thus, under Plan X the company in effect would become its own insurer, and assume full liability to pay all losses within the $5,000/$10,000 primary limits. In addition it would guarantee a profit to the insurance company, because for every $60 of losses which the insurance company paid, it could recover $100 from Ready Truck Lines. If Plan X was legally in effect, as plaintiffs contend, the insurance company would profit in excess of $20,000 from the transaction for the period from August 5, 1948, to June 1, 1949.

It is quite understandable why the insurance company endeavored to amend its policy to include Plan X. Then it could not lose. It would not be undertaking any

risk. It is equally understandable why Sidney J. Williams, the actual owner of the capital stock of the company,[1] was so emphatically opposed to the plan. He told Lyons and Raub that he considered the signing of such a document tantamount to signing away the assets of the company by exposing the company to unlimited liability.

Ordinarily the ordering of a policy of liability insurance might be considered as in the usual and normal course of business for a truck line, but we are not confronted with an ordinary situation in the case at bar. Williams, who had negotiated the original policy and who was the general manager of the company, was violently opposed to Plan X. He felt the adoption of such a plan would endanger the assets of the company, and of course no-one was as much concerned as he that the value of those assets be preserved. Williams told the two representatives of the insurance company that he would never agree to the adoption of the plan. He warned them that any agreement incorporating such a plan into the existing liability policy would be invalid without his signature. We think the district court erred in holding the transaction to be within the normal and usual course of business of Ready Truck Lines, and that the signing by Friedman was binding on the company.

Nor is the company estopped from insisting that the lack of authority of Friedman, to agree to the adoption of Plan X, resulted in the original policy remaining unchanged. Twice Williams testified that he did not know that Plan X had been executed. The premiums were billed monthly in the same manner as prior to December 8, 1948. Although Plan X provided that the incurred losses should be reviewed quarterly, the insurance company made no claim for payments of premium under the plan until after the insurance policy had been cancelled by the company. We hold that Plan X never became legally effective.

Judgment reversed.

1. The purchasers had made only a small down payment on the stock. The record shows that they defaulted on their agreements to purchase, and Williams again became the owner of the stock.